**FILED**
CLERK, U.S. DISTRICT COURT

August 24, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___VPC___ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

METROPOLITAN LIFE
INSURANCE COMPANY,

                Plaintiff-in-Interpleader,

v.

CAROLYN JEANNE FOWLER; and
CAROLYN DENISE WASHINGTON,

                Defendants-in-Interpleader.

Case No. 2:20-cv-05535-SB (KKx)
Case No. 5:20-cv-00199-SB (KKx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Trial:  July 6, 2021 at 8:30 a.m.

    The Court held a bench trial in this case on July 6, 2021 at 8:30 a.m. Defendants-in-Interpleader Carolyn Jeanne Fowler and Carolyn Denise Washington[1] appeared in propia persona.  All witnesses submitted their direct testimony through declarations.  The parties stipulated to allow the Court to conduct any and all cross-examination, though they were given an opportunity to conduct their own cross-

---

[1] The Court refers to her as Defendant Washington rather than Defendant Washington-Fowler to avoid confusion.  For similar reasons, the Court refers to Dallas Fowler, the daughter of Defendant Fowler and Decedent, as Dallas.

1

examination at trial.  After evaluating the evidence at trial, the Court issues the findings of fact and conclusions of law as set forth below.[2]

FINDINGS OF FACT

1.     Decedent, Felix Fletcher Fowler Jr., married Defendant Carolyn Jeanne Fowler (Defendant Fowler) on September 25, 1976 in Detroit, Michigan.  (ECF-1 No. 1-3.)[3]

2.     At the time of their marriage, Decedent was employed by General Motors (GM).  He was a participant in GM's Pension Plan (Plan), an ERISA-governed employee benefit plan.  Decedent retired from GM on October 1, 2003, at which time he indicated he was not married.  (ECF-1 No. 1 ¶¶ 6-7.)

3.     Decedent was also a participant in a life insurance plan as a part of his employment with GM.  Under the Plan, Metropolitan Life Insurance Company (MetLife) funded certain life insurance benefits.  At the date of Decedent's death, he had $38,850 in life insurance coverage under the Plan.  (ECF-2 No. 1 ¶¶ 6-7.)

4.     In 1976, Decedent designated Defendant Fowler as his life insurance beneficiary.  In 1984, Decedent changed the beneficiary from Defendant Fowler to their daughter, Dallas Fowler (Dallas).  (Ex. C-1, 2.)

5.     Decedent and Defendant Fowler never divorced, although they "formally separated" in 1988.  (ECF-1 No. 60 ¶ 4.)  While Decedent filed a complaint for divorce in Los Angeles Superior Court on February 9, 1990, the Los Angeles Superior Court has no recorded judgment of divorce in that case.  (ECF-1 No. 66.)

---

[2] The characterization of a finding as one of "fact" or "law" is not controlling.  To the extent that a finding is characterized as one of "law" but is more properly characterized as one of "fact" (or vice versa), substance shall prevail over form.

[3] References to "ECF-1" are to documents in Case No. 5:20-cv-00199.  References to "ECF-2" are to documents in in Case No. 2:20-cv-05535.

6.      Decedent married Defendant Carolyn Denise Washington (Defendant Washington) on February 24, 2007 in Los Angeles, California.  (ECF-1 No. 1-4.)

7.      In 2007, Decedent changed his life insurance beneficiary to Defendant Washington.  (Ex. 42.)

8.      In September 2017, Decedent's health started to fail.  He began having seizures and was hospitalized from October 17, 2017 through November 8, 2017. During his hospital stay, he had brain surgery.  (Ex. 111, Part 3.)

9.      On February 8, 2018, a few months after Decedent's hospitalization, Dallas called GM Benefits and Services Center and spoke with a MetLife representative who identified herself as "Shannon."  Dallas told Shannon that she was calling on behalf of her father, Decedent, that her father was present with her, and that she was calling to obtain proof of life insurance to assist her father in applying for senior housing.  (Ex. 118-9, 123 Part 3.)

10.     After providing the requested assistance, Shannon asked:  "Anything else that I can help with today?  Dallas responded that her father appeared to have a "spousal policy . . . [t]hat I think we talked about canceling."  Dallas then stated that the policy has "the incorrect spouse"; and Shannon responded that "we can change the beneficiary over the phone" so long as Dallas's father spoke.

11.     When Decedent spoke to Shannon, he struggled to provide basic information to verify his identity.  A person in the background appeared to assist him (in whole or part) in providing information about his address, telephone number, and date of birth.  And when asked about his GM employment, Decedent was unable to accurately provide the number of years he worked there.  A person in the background corrected him, stating "I thought you had 31 or 32 years" (rather than 27 years).

12.     Decedent also seemed confused about the change in beneficiary.  When Shannon asked him "who [he] would like to be the beneficiary," he responded:  "Uh, I have no beneficiary."  At that point, a person in the background stated something inaudible, and Decedent then said:  "But, Car-, Carolyn Fowler, is my beneficiary."

1  Shannon then asked whether he wanted Carolyn Fowler to be his beneficiary, and

2  Decedent responded:  "Well, she is my beneficiary, really."  Shannon then asked basic

3  information about Defendant Fowler (i.e., address, telephone, and date of birth), and

4  Decedent appeared unable to respond without assistance from the person in the

5  background.

6       13.    At the time of the change in beneficiary, Decedent was homeless and

7  living in various motels by himself.

8       14.    Decedent died on July 16, 2019.  (ECF-1 No. 1-2.)

9       15.    Under the Plan, Decedent's surviving spouse is entitled to certain pension

10  benefits.  If Defendant Fowler is determined to be the surviving spouse, the gross

11  monthly benefit is $1,028.97.  If Defendant Washington is determined to be the

12  surviving spouse, the gross monthly benefit is $1,018.14.  (ECF-1 No. 1 ¶ 14.)

13       16.    On July 24, 2019, Defendant Fowler submitted a claim to the Plan for life

14  insurance benefits.  (*Id.* ¶ 14.)

15       17.    On July 25, 2019, Defendant Washington submitted a "rival" claim for

16  life insurance benefits.  (*Id.* ¶ 15.)  On July 26 and July 30, 2019, she submitted more

17  information to support her claim.  (*Id.* ¶ 16.)

18       18.    On July 30, 2019, Defendant Washington submitted a second claim and

19  continued to send information to support her claims through August and September

20  2019.  (*Id.* ¶¶ 17-18, n.1.)

21       19.    In September 2019, MetLife received a transcript of the phone call in

22  which Decedent changed the beneficiary for the Plan life insurance benefits to

23  Defendant Fowler.  (*Id.* ¶ 19.)

24       20.    On September 30, 2019, MetLife sent Defendant Washington a letter

25  stating that she was not the named beneficiary and her claim to the life insurance was

26  denied.  Defendant Washington filed an appeal, as to which no decision has been

27  issued.  (*Id.* ¶¶ 20-22.)

28

21.     Defendant Fowler contends that she is entitled to the Plan pension and life insurance benefits as the surviving spouse.

22.     Defendant Washington contends that she is entitled to the Plan pension and life insurance benefits as the surviving spouse.

<u>CONCLUSIONS OF LAW</u>

23.     Courts apply the law of the decedent's state of domicile to determine which marriage is valid, as they are the most interested in the questions of the insured's marital statuses.  *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006).  The parties do not dispute the fact that Decedent was domiciled in California at the time of his death.

24.     In California, a subsequent marriage contracted while a person is already married is void unless: (1) "The former marriage has been dissolved or adjudged a nullity before the date of the subsequent marriage" or (2) "The former spouse (A) is absent, and not known to the person to be living for the period of five successive years immediately preceding the subsequent marriage, or (B) is generally reputed or believed by the person to be dead at the time of the subsequent marriage was contracted."  Cal. Fam. Code § 2201(a).

25.     The Court finds Defendant Washington's marriage to Decedent is void as bigamous.  Defendant Fowler was still married to Decedent at the time of his subsequent marriage to Defendant Washington.  There is no evidence that Decedent's marriage to Defendant Fowler was dissolved or annulled.  Nor is there evidence that Decedent believed Defendant Fowler to be dead.  To the contrary, Decedent kept in touch with Defendant Fowler during his marriage to Defendant Washington.  The Court therefore concludes that Defendant Fowler is the lawful spouse of Decedent and entitled to the Plan pension benefits.

26.     Defendant Washington maintains that she is nonetheless entitled to the Plan pension benefits as a putative spouse.  When a marriage is invalid, an innocent

party may be entitled to relief under the putative spouse doctrine, which entitles a person to the benefits of the marriage if they had a good faith belief that their marriage is valid. *In re Marriage of Tejeda*, 179 Cal. App. 4th 973, 980 (Cal. 2009); Cal. Fam. Code § 2251.

27.   A putative spouse is entitled to community property interest in the decedent's benefits if the contributions to those benefits occurred during the putative marriage. *W. Conf. of Teamsters Pension Tr. Fund v. Jones*, 646 F. Supp. 228, 230-33 (N.D. Cal. 1986) (discussing California law). "Specifically regarding pension benefits, California law considers such assets, vested or unvested, as community property to the extent these benefits derive from employment during marriage." *Id*. at 231. California law has "always recognized that the community owns all pension rights attributable to employment during the marriage." *In re Marriage of Brown*, 15 Cal. 3d 838, 844 (1976).

28.   The Court finds that Defendant Washington is not entitled to the pension benefits as a putative spouse because those benefits are not quasi-community property. "Under California law, property acquired by either husband or wife during a marriage generally constitutes 'community property.'" *United States v. Berger*, 574 F.3d 1202, 1205 (9th Cir. 2009). This principle has been extended to putative marriages. *See Allen v. W. Conf. of Teamsters Pension Tr. Fund*, 788 F.2d 648, 649 (9th Cir. 1986) ("Property acquired during the putative marriage ('quasi-marital property') is to be treated as if it were community property."). Here, however, Decedent had stopped working for GM and contributing to the Plan in 2003—years before he married Defendant Washington in 2007. Thus, even though Defendant Washington may have had a good faith belief that her marriage was valid, she has no claim to property acquired solely during Decedent's marriage to Defendant Fowler.

29.   The MetLife policy, however, requires a different analysis. Under the terms of the Plan life insurance policy, Decedent was entitled to select the beneficiary who would receive the death benefit. While Defendant Fowler is the named

6

beneficiary, Defendant Washington contends that the change in beneficiary is invalid because it was the product of undue influence.

30.     Undue influence is statutorily defined as consisting of: "(1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; (2) In taking an unfair advantage of another's weakness of mind; or, (3) In taking a grossly oppressive and unfair advantage of another's necessities or distress." Cal. Civ. Code § 1575.  In evaluating undue influence, courts consider: (1) the vulnerability of the victim; (2) the influencer's apparent authority; (3) the actions or tactics used by the influencer; and (4) the equity of the result.  Cal. Welf. & Inst. Code § 15610.70(a).

31.     A party seeking to invalidate a beneficiary designation on the grounds of undue influence ordinarily bears the burden of proof by a preponderance of the evidence.  *Hover v. Chapman*, No. E031071, 2002 WL 31458296, at *3 (Cal. Ct. App. Nov. 5, 2002).  However, the burden of proof may shift, and a presumption of undue influence arises, upon a challenger's showing that: "(1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." *Rice v. Clark*, 28 Cal. 4th 89, 96-97 (2002).

32.     A confidential relationship exists when "one party gains the confidence of the other and purports to act or advise with the other's interest in mind . . . it is particularly likely to exist when there is a family relationship or one of friendship." *Estate of Sanders,* 40 Cal. 3d 607, 615 (1985).  The existence of a confidential relationship is a question of fact.  *Richelle L. v. Roman Catholic Archbishop*, 106 Cal. App. 4th 257, 272 n. 6 (2003).  A person unduly benefits when she receives a bequest that is "'unwarranted, excessive, inappropriate, unjustifiable or improper.'" *Estate of Auen*, 30 Cal. App. 4th 300, 311 (1994), superseded by statute on other grounds.  The

benefit need not be direct: "[a]n undue benefit can be shown by benefit to the person in the confidential relationship or by benefit to another person." *Id*. at 312; *see Cortez v. Orozco*, No. G057625, 2020 WL 6707966, at *4 (Cal. Ct. App. Nov. 16, 2020) (finding evidence of undue benefit to a person whose daughter would benefit).[4]

33.    Based on the record before it, the Court finds that the change of beneficiaries from Defendant Washington to Defendant Fowler in 2018 was the product of undue influence.  Defendant Washington had been the designated beneficiary for eleven years.  At the time of the change, Decedent appeared to be in a vulnerable state.  He recently had suffered a serious medical condition that resulted in brain surgery and was relying on the assistance of others, including Dallas, to obtain stable housing.  During the MetLife call, Decedent seemed confused and unable to remember basic information.

34.    Dallas appeared to exercise influence over her father.  Dallas had a confidential relationship with Decedent, and she was active in procuring the change in beneficiary.  The primary purpose of the phone call to MetLife was to obtain information necessary to apply for senior housing.  After obtaining the information, Dallas—on her own initiative and without prompting by Decedent—requested to change Decedent's spousal beneficiary.  On that subject, Dallas stated only that she thought that she and her father had discussed canceling the policy.  It was Dallas who then suggested that the policy has "the incorrect spouse."  For his part, Decedent seemed confused.  When asked about changing the beneficiary, Decedent stated that he had no beneficiary.  It was only after being prompted by a person in the background (presumably Dallas) that Decedent stated that "Carolyn Fowler is my beneficiary."

---

[4] The Court may consider unpublished decisions. *Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value.").

35.     In concluding that Dallas exercised undue influence over Decedent, the Court has considered several factors.  First, Decedent was vulnerable to influence as clearly manifested by his confused participation in the phone call that procured the change in beneficiary.  Second, Dallas had her father's confidence in view of the relationship and as evidenced by her influence over him during the phone call as she directed him throughout it.  Third, Dallas appears to have initiated the change in beneficiary without first consulting with Decedent, who stated that he was not even aware that he had designated a beneficiary.  Fourth, Dallas indirectly benefited from the change by having her mother rather than Defendant Washington receive the life insurance benefits.  Fifth, Decedent changed the designated beneficiary in 1984 from Defendant Fowler to Dallas, and then changed the beneficiary to Defendant Washington in 2007 after marrying her.  For 11 years, Defendant Washington was the designated beneficiary until Dallas initiated a call that changed things back to the way they were 34 years earlier.  The Court is not convinced that this reversion was the product of Decedent's free will.

36.     The Court reaches this conclusion irrespective of which party bears the burden of proof.  The record supports a presumption of undue influence because Dallas had a confidential relationship with Decedent, participated in the change in beneficiaries, and indirectly benefited from the change by directing the benefits to her mother.  The indirect benefit is inappropriate and unjustifiable because Defendant Washington had been the intended beneficiary for 11 years and the evidence does not show that Decedent deliberately sought to change that fact.  But even if the facts were insufficient to give rise to a presumption, the Court nevertheless would find that Defendant Washington has shown undue influence by a preponderance of the evidence for the reasons discussed above.

37.     The Court finds that Defendant Washington is entitled to the MetLife life insurance benefit as the designation to Defendant Fowler was a product of undue influence.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISPOSITION

In light of the above-stated findings of fact and conclusions of law, the Court finds that Defendant Fowler is entitled to the Plan pension benefits and Defendant Washington is entitled to the Plan life insurance benefits.  The Court will enter a judgment separately.


Dated:  August 24, 2021

_____
Stanley Blumenfeld, Jr.
United States District Judge